IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EATON CORPORATION, EATON AEROSPACE LLC; EATON ELECTRICAL INC. and EATON HYDRAULICS INC., | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 19-2269 (MN) |
| | ) | |
| RICHARD J. GEISENBERGER, in his capacity as the Secretary of Finance and the Acting Delaware State Escheator; and MICHELLE M. SULLIVAN in her capacity as the Assistant Director of the Office of Unclaimed Property, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| FRUIT OF THE LOOM, INC., UNION UNDERWEAR COMPANY, INC., VANITY FAIR BRANDS, LP, and RUSSELL BRANDS, LLC, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 19-2273 (MN) |
| | ) | |
| RICHARD J. GEISENBERGER, in his capacity as the Secretary of Finance for the State of Delaware; BRENDA MAYRACK, in her capacity as the Delaware State Escheator; and MICHELLE M. SULLIVAN, in her capacity as the Assistant Director of the Office of Unclaimed Property, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | | |

| | |
|---|---|
| SIEMENS USA HOLDINGS, INC. and SIEMENS INDUSTRY, INC.<br><br>Plaintiff,<br><br>v.<br><br>RICHARD J. GEISENBERGER, in his capacity as the Secretary of Finance for the State of Delaware; BRENDA MAYRACK, in her capacity as the Delaware State Escheator; and MICHELLE M. SULLIVAN in her capacity as the Assistant Director of the Office of Unclaimed Property, and the STATE OF DELAWARE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)  C.A. No. 19-2284 (MN)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **MEMORANDUM OPINION**

Arthur G. Connolly, III, Max Walton, Matthew F. Boyer, Lisa R. Hatfield, CONNOLLY GALLAGHER LLP, Wilmington, DE; Melanie K. Sharp, Martin S. Lessner, Mary F. Dugan, Robert M. Vrana, YOUNG CONAWAY STARGATT & TAYLOR, LLC, Wilmington, DE; Caroline Lee Cross, Elizabeth R. McFarlan, DELAWARE DEPARTMENT OF JUSTICE, Wilmington DE – Attorneys for Defendants

R. Eric Hutz, REED SMITH LLP, Wilmington, DE; Diane Green-Kelly, REED SMITH LLP, Chicago, IL – Attorneys for Plaintiffs

September 15, 2020
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

Before the Court are three related declaratory judgment actions – Civil Action Nos. 19-2269, 19-2273, and 19-2284, referred to herein as *Eaton*, *FOTL*, and *Siemens*, respectively[1] – raising similar issues against largely the same Defendants[2] regarding audits being conducted under Delaware's Escheat Law.  In each action, Defendants have filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedures and the respective plaintiffs have each filed a motion for preliminary injunction.  As the parties agree that the cases are related, (*e.g.*, *Eaton*, D.I. 23 (writing on behalf of Defendants); *id.*, D.I. 24 (writing on behalf of Plaintiffs)), and each set of briefs makes similar arguments, the Court addresses all six motions here, considering any unique arguments and issues as necessary.  For the reasons set forth below, Defendants' motions to dismiss (*Eaton*, D.I. 14; *FOTL*, D.I. 15; *Siemens*, D.I. 11) are each granted-in-part and denied-in-part and Plaintiffs' motions for preliminary injunctions (*Eaton*, D.I. 27; *FOTL*, D.I. 24; *Siemens*, D.I. 22) are each denied.

---

[1]     The plaintiffs in Civil Action No. 19-2269 are Eaton Corporation, Eaton Aerospace LLC, Eaton Electrical Inc., and Eaton Hydraulics Inc. (collectively with all audited related entities, "Eaton" or "Eaton Plaintiffs"); the plaintiffs in Civil Action No. 19-2273 are Fruit of the Loom, Inc., Union Underwear Company, Inc., Vanity Fair Brands, LP, and Russell Brands, LLC (collectively with all audited related entities, "FOTL" or "FOTL Plaintiffs"); and the plaintiffs in Civil Action No. 19-2284 are Siemens USA Holdings, Inc. and Siemens Industry, Inc. (collectively with all audited related entities, "Siemens" or "Siemens Plaintiffs").  When not specified, references in this opinion to "Plaintiffs" includes all such entities.

[2]     "Defendants" refers collectively to all defendants in the three related cases: Richard J. Geisenberger, in his capacity as the Secretary of Finance for the State of Delaware, Brenda R. Mayrack, in her capacity as the State Escheator of the State of Delaware, Michelle M. Sullivan, in her capacity as the Assistant Director of the Delaware Office of Unclaimed Property, and the State of Delaware.  The State of Delaware, however, is only subject to suit by Siemens (C.A. 19-2284).  Thus, the Court employs "Individual Defendants" to refer to all Defendants except the State, and "the State" or "State of Delaware" to refer solely to the State.

# I.    BACKGROUND

## A.    The Law

These cases are more in the line of cases challenging aspects or application of Delaware's Escheat Law, commonly referred to as the Delaware Unclaimed Property Law or "UPL," Del. Code Ann. tit. 12, § 1101 *et seq.*[3]  Derived from feudal property concepts, "[a]n escheat is a procedure by which 'a sovereign may acquire title to abandoned property if after a number of years no rightful owner appears.'" *Univar, Inc. v. Geisenberger*, 409 F. Supp. 3d 273, 276 (D. Del. 2019) (quoting *Texas v. New Jersey*, 379 U.S. 674, 675 (1965)).

Despite societal evolution away from feudalism, the concept of "escheat" remains.  Today, "the state steps in the place of the feudal lord, by virtue of its sovereignty."  *Escheat*, Black's Law Dictionary (11th ed. 2019) (quoting James Kent, *Commentaries on American Law* *423-24 (George Comstock ed., 11th ed. 1866)); *Marathon Petroleum Corp. v. Sec'y of Fin. for Delaware*, 876 F.3d 481, 486-87 (3d Cir. 2017) (quoting the same with approval).  "Every state and the District of Columbia has a set of escheat laws, under which holders of abandoned property must turn such property over to the State 'to provide for the safekeeping of abandoned property and then to reunite the abandoned property with its owner.'"  *Marathon*, 876 F.3d at 488 (quoting *N.J. Retail Merchs. Ass'n v. Sidamon–Eristoff*, 669 F.3d 374, 383 (3d Cir. 2012)).

As the Third Circuit has explained, however, such laws are not always warmly regarded:

> . . . "in recent years, state escheat laws have come under assault for being exploited to raise revenue rather than" to safeguard abandoned property for the benefit of its owners.  *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 536 (3d Cir. 2017).  Two Justices of the

---

[3]     *See Univar, Inc. v. Geisenberger*, 409 F. Supp. 3d 273, 276 n.2 (D. Del. 2019) ("This is not the first time aspects of the UPL have been challenged." (citing *Plains All American Pipeline, L.P. v. Cook*, 201 F. Supp. 3d 547 (D. Del. 2016); *Marathon Petroleum Corp. v. Cook*, 208 F. Supp. 3d 576, 576 (D. Del. 2016); *Temple-Inland, Inc. v. Cook*, 192 F. Supp. 3d 527, 531 (D. Del. 2016))).

> United States Supreme Court [relatively] recently noted their concern that states are "doing less and less to meet their constitutional obligation to" reunite property owners with their property before seeking escheatment, even as they more aggressively go about classifying property as abandoned. *Taylor v. Yee*, — U.S. —, 136 S.Ct. 929, 930, 194 L.Ed.2d 237 (2016) (Alito, J., joined by Thomas, J., concurring in the denial of certiorari) (discussing a challenge to California's procedure for notifying property owners). Delaware is "no exception, as unclaimed property has become Delaware's third-largest source of revenue." *Plains All Am. Pipeline*, 866 F.3d at 536.

*Marathon*, 876 F.3d at 488-89. "In fact, it has been pointed out that Delaware in particular 'relies on decidedly old-fashioned methods for providing notice of escheatment, methods that are unlikely to be effective.'" *Id.* at 489 n.10 (quoting *Taylor*, — U.S. —, 136 S.Ct. at 930 (Alito, J., concurring)). In other words, it appears that many observers – not to mention targeted parties – have come to think "escheat" should be written without the initial "es."

In the wake of criticisms – and contrary judicial rulings – several states, including Delaware, have revised their escheat laws. Today, Delaware's UPL, as amended in 2017, authorizes the State Escheator to, *inter alia*, enforce the UPL and "[e]xamine the records of a person or the records in the possession of an agent, representative, subsidiary, or affiliate of the person under examination in order to determine whether the person complied with [the law]." 12 *Del. C.* § 1171(1). The State Escheator may also "[i]ssue an administrative subpoena to require that [any] records [requested] be made available for examination" and may "[b]ring an action in the Court of Chancery seeking enforcement of" such a subpoena. *Id.* § 1171(3), (4).

The UPL also imposes a record retention requirement on entities subject to it, *see id.* § 1145, and authorizes the use of estimation to determine escheat liability should companies fail to keep the mandated records, *see id.* § 1176(a). The UPL further levies limited interest and penalties on those who fail to timely turn over unclaimed property, as well as in certain other circumstances, *see id* §§ 1183-84, though it allows the State Escheator to waive most such

additional costs in several situations, *see id.* § 1185, including for audited parties if "the person under examination" elects to "expedite" the audit, *see id.* § 1172(c).

If the audited party makes such an election, the "person conducting the examination," is required to make all requests for records, testimony, and information within eighteen months. *Id.* § 1172(c)(3). Additionally, if the expediting party "responds within the time and in the manner established by the State Escheator to all" such requests, the State Escheator is required "to complete the examination and provide a final examination report within 2 years." *Id.* § 1172(c)(2). Determining whether an expediting party has complied with its side of the bargain – and whether to terminate expediting the examination if the party has not – is at the "complete discretion of the State Escheator and subject only to the review of the Secretary of Finance." *Id.* § 1172(c)(4).

### B.   The Cases

Plaintiffs brought the instant lawsuits on December 12 and 13, 2019. (*See Eaton*, D.I. 1; *FOTL*, D.I. 1; *Siemens*, D.I. 1). The Complaints paint similar pictures:

- Each set of plaintiffs (or companies controlled by those plaintiffs) is currently being audited by Defendants for compliance with the UPL, (*e.g.*, *Eaton*, D.I. 1 ¶ 1; *FOTL*, D.I. 1 ¶ 1; *Siemens*, D.I. 1 ¶ 1);[4]

---

[4]     Plaintiff Eaton Corp. is an Ohio corporation with a principal place of business in Ohio. (*Eaton*, D.I. 1 ¶ 61). It owns 100% of the shares of the other Eaton Plaintiffs, which are all current or former Delaware corporations with principal places of business in Ohio or Pennsylvania. (*Id.* ¶¶ 61-64). Plaintiff Fruit of the Loom Inc. is a Delaware corporation that serves as the parent holding company of the other FOTL Plaintiffs, each of which is headquartered in Kentucky. (*FOTL*, D.I. 1 ¶¶ 91-93). Plaintiff Siemens USA Holdings Inc. is a Delaware corporation with a principal place of business in Washington, D.C. (*Siemens*, D.I. 1 ¶ 77). It is the parent of Siemens Corporation, which at various relevant times was or presently is the parent of a number of entities that have or are still being audited by Defendants, including Plaintiff Siemens Industry Inc., which is based in the state of Georgia. (*Id.* ¶¶ 76-77). Further details of the relationship(s) between the various plaintiffs and relevant related parties in each case, as well as each entity's role in the respective audits, is described in the Complaints. (*See, e.g.*, *Eaton*, D.I. 1 ¶¶ 61-64; *FOTL*, D.I. 1 ¶¶ 91-93; *Siemens*, D.I. 1 ¶¶ 76-77).

- Each audit was assigned by Defendants to one of two "contract auditors" hired on a contingent fee basis – Kelmar Associates, LLC ("Kelmar") was assigned the Eaton and Siemens audits, (*e.g.*, *Eaton*, D.I. 1 ¶ 42; *Siemens*, D.I. 1 ¶ 55), and Innovative Advocates Group, LLC ("IAG") was assigned the FOTL audit, (*e.g.*, *FOTL¸*D.I. 1 ¶ 34);

- Each audit began before *Temple-Inland v. Cook*, 192 F. Supp. 3d 527 (D. Del. 2016), in which the court found various of Delaware's activities during an unclaimed property audit to, *inter alia*, "shock the conscience" in violation of due process; before the Delaware legislature revised the UPL (effective February 2, 2017); and before the Delaware Secretary of Finance revised the applicable regulations (effective October 1, 2017), (*e.g.*, *Eaton*, D.I. 1 ¶ 101; *FOTL*, D.I. 1 ¶ 99; *Siemens*, D.I. 1 ¶ 76);

- Each audited party elected to expedite under the 2017 UPL revisions, (*e.g.*, *Eaton*, D.I. 1 ¶ 49; *FOTL*, D.I. 1 ¶ 67; *Siemens*, D.I. 1 ¶ 106);

- Each audited party was asked to produce records dating back at least fifteen years, (*e.g.*, *Eaton*, D.I. 1 ¶ 106; *FOTL*, D.I. 1 ¶ 102; *Siemens*, D.I. 1 ¶¶ 98, 104);

- Each third-party auditor applied a presumption of abandonment for "aged" checks – *i.e.*, checks outstanding 90 or more days from issuance and checks voided 30 or more days from issuance – and gave Plaintiffs the opportunity to conduct research to refute the presumption of abandonment (*i.e.*, to "remediate"), (*e.g.*, *Eaton*, D.I. 1 ¶ 113; *FOTL*, D.I. 1 ¶ 106; *Siemens*, D.I. 1 ¶ 115);

- Each set of plaintiffs attempted to remediate items, but refused to do so for items with owner addresses in other domestic states, at least after the *Temple-Inland* decision, (*e.g.*, *Eaton*, D.I. 1 ¶ 52; *FOTL*, D.I. 1 ¶¶ 83, 108; *Siemens*, D.I. 1 ¶¶ 108, 116);

- Each audited party was issued one or more status reports (most labeled "Interim" or "Preliminary") in 2019, either by Defendant State Escheator Sullivan or by their contract auditor at Defendants' direction, that calculated their potential escheat liability under the UPL, (*e.g.*, *Eaton*, D.I. 1 ¶¶ 2-3, Ex. A-B; *FOTL*, D.I. 1 ¶¶ 2, 68, Ex. A, Q; *Siemens*, D.I. 1 ¶ 109, Ex. A-B);

- Each 2019 report relied on estimation for between 81.4% and 99.5% of the liability calculated, (*e.g.*, *Eaton*, D.I. 1 ¶¶ 2-3; *FOTL*, D.I. 1 ¶¶ 108-15; *Siemens*, D.I. 1 ¶¶ 2, 112);

- Each estimate in the 2019 reports was based on records of checks and credits Delaware cannot claim under federal law, including checks and credits with owner addresses outside of Delaware, (*e.g.*, *Eaton*, D.I. 1 ¶¶ 2-3, 145, 147; *FOTL*, D.I. 1 ¶¶ 108-15; *Siemens*, D.I. 1 ¶¶ 43, 112, 147); and

- Each expedited audit at issue was terminated by Defendants on December 11, 2019, five days after the statutory deadline for Defendants to issue a final examination report and demand for payment under the expediting provisions of the UPL, (*e.g.*, *Eaton*, D.I. 1 ¶ 5; *FOTL*, D.I. 1 ¶ 3; *Siemens*, D.I. 1 ¶ 69).

Additionally, when Siemens' audit began, Siemens – pursuant to an apparently unique agreement it entered into with the State Escheator ("Letter Agreement") – paid $7.4 million to the State as a self-estimated advance deposit against its escheat liability. (*Siemens*, D.I. 1 ¶ 94).  If the advance is ultimately excessive, the remainder is to be refunded; if materially short, however, a Siemens-related entity will be subject to adverse consequences.  (*Id.* ¶ 88).

Each Complaint sets forth four counts: one each for federal preemption of the UPL (both facially and as applied), Fourteenth Amendment substantive due process violations (as applied), Fourteenth Amendment procedural due process violations (as applied), and Fourth Amendment violations (facially).  (*Eaton*, D.I. 1 ¶¶ 1, 44, 148-93; *FOTL*, D.I. 1 ¶¶ 1, 86, 137-75; *Siemens*, D.I. 1 ¶¶ 1, 73, 137-77).  Plaintiffs seek declaratory and injunctive relief; specifically, declarations by this Court that:

- Federal common law, i.e., the United States Supreme Court's "*Texas* Trilogy" line of cases, bars Delaware from estimating the amount of unclaimed property it can claim from Plaintiffs;

- Federal common law, i.e. the "*Texas* Trilogy" line of cases, preempts sections of the UPL and accompanying regulations that authorize the State Escheator to employ estimation and ignore owner addresses to estimate abandoned property escheatable to Delaware;

- Federal common law conflicts with and preempts aspects of Defendants' audits, including their continuing audit of property with customer addresses in other states that Delaware cannot claim under the "*Texas* Trilogy"; and

- Retroactive enforcement of the same UPL sections and accompanying regulations violates Plaintiffs' rights to substantive due process;

- Defendants' use of contingent-fee auditors to conduct the unclaimed property audits and determine liability violates Plaintiffs' rights to procedural due process;

6

- The UPL violates due process and the Fourth Amendment of the United States Constitution because it does not provide for pre-enforcement review of Defendants' termination of Plaintiffs' expedited audit election.

(*Siemens*, D.I. 1 ¶ 73; *accord Eaton*, D.I. 1 ¶ 44; *FOTL*, D.I. 1 ¶ 86). Plaintiffs also seek injunctions enjoining Defendants from enforcing the UPL against them, including by auditing property with owner addresses in other states, by enforcing any assessment against them based on such property, by assessing estimated liabilities, by using self-interested auditors to conduct the audits, and by imposing interest and penalties based on such estimates. (*See Eaton*, D.I. 1 ¶ 45; *FOTL*, D.I. 1 ¶ 87; *Siemens*, D.I. 1 ¶ 74).

Defendants responded to the Complaints with the instant motions to dismiss, which seek dismissal of all "challenges to the scope and means of the examination[s] . . . under Rule 12(b)(1) for lack of ripeness," and dismissal of any ripe claims under Rule 12(b)(6) for failure to state a claim. (*Siemens*, D.I. 12 at 3; *accord Eaton*, D.I. 15 at 1-2; *FOTL*, D.I. 16 at 1-2). Alternatively, but solely with respect to Siemens, Defendants argue that any claims not struck down under Rules 12(b)(1) or 12(b)(6) should be dismissed without prejudice under the doctrines of abstention and comity. (*Siemens*, D.I. 12 at 3, 19-20; *see also Eaton*, D.I. 15 at 1-2; *FOTL*, D.I. 16 at 1-2).

While their motions to dismiss were pending, Defendants, in April, sent letters to Plaintiffs reiterating their desire to resume the audits, though apparently on a non-expedited basis. (*Eaton*, D.I. 28 at 2; *FOTL*, D.I. 25 at 6; *Siemens*, D.I. 23 at 2). In response, Plaintiffs filed the instant motions for preliminary injunctions seeking "to enjoin Defendants from enforcing the audit[s], judicially or otherwise, outside this lawsuit until there is a final ruling on the merits of [their] claims." (*Eaton*, D.I. 28 at 2; *accord FOTL*, D.I. 25 at 2; *Siemens*, D.I. 23 at 2).

The Court first reviews Defendants' challenges under Rules 12(b)(1), then their challenges under Rule 12(b)(6), followed by Plaintiffs' motions for preliminary injunctive relief, and, finally, Defendants' request for abstention in the Siemens matter.

## II.  MOTIONS TO DISMISS

After review, the Court finds that Plaintiffs' substantive due process and federal preemption claims are not ripe but that their procedural due process and Fourth Amendment claims are; the State of Delaware is entitled to sovereign immunity on all claims asserted against it; and Plaintiffs have failed to state claims for procedural due process or Fourth Amendment violations based on lack of review by a neutral arbiter prior to the State Escheator's termination of an expediting election, but have stated procedural due process claims based on the appointment of third-party contingent fee auditors to conduct their audits.

### A.  Legal Standards

#### 1.  Subject Matter Jurisdiction and Ripeness Under Rule 12(b)(1)

"If the court determines . . . it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).  Motions brought under Rule 12(b)(1) for lack of subject matter jurisdiction may present either a facial or factual challenge to the court's jurisdiction. *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (citations omitted). A challenge is facial when a motion to dismiss is filed prior to an answer and thereby asserts that the complaint, on its face, is jurisdictionally deficient. *Cardio-Med. Assocs., Ltd. v. Crozer-Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983).  In reviewing a facial challenge under Rule 12(b)(1), the standards relevant to Rule 12(b)(6) apply. *Lincoln*, 800 F.3d at 105 ("'In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.'" (quoting *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir.2000)).  The party asserting that federal jurisdiction exists has the burden of establishing subject matter jurisdiction. *Id.* (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006).

## 2.    Failure to State a Claim Under Rule 12(b)(6)

When presented with a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), district courts conduct a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the Court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Second, the Court determines "whether the facts alleged in the complaint are sufficient to show . . . a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679).

"To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Dismissal under Rule 12(b)(6) is appropriate if a complaint does not contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Fowler*, 578 F.3d at 210. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Court is not obligated to accept as true "bald assertions" or "unsupported conclusions and unwarranted inferences." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 & n.8 (3d Cir. 1997); *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997). Instead, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321-22 (3d Cir. 2008) (internal citations and quotation marks omitted).

B.     **Discussion**

1.     **Ripeness**

For a federal court to exercise jurisdiction over a case, the matter must be ripe for review. *See Thompson v. Borough of Munhall*, 44 F. App'x. 582, 583 (3d Cir. 2002).  "Ripeness is a separate doctrine from standing, but both doctrines originate from the same Article III requirement of a case or controversy."  *Free Speech Coal., Inc. v. Attorney Gen. United States*, 825 F.3d 149, 167 n.15 (3d Cir. 2016) (citations omitted).  "The ripeness doctrine serves to 'determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.'" *Khodara Envtl., Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004) (citations omitted).  The purpose of the ripeness doctrine "is to prevent the courts . . . from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *accord Plains*, 866 F.3d at 539.

Under Third Circuit law, courts analyze three factors to determine whether a declaratory judgment action is ripe: "first, the adversity of the parties' interests; second, the probable conclusiveness of a judgment; third, the practical utility to the parties of rendering a judgment." *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 342 (3d Cir. 2001) (citing *Pic–A–State Pa., Inc. v. Reno*, 76 F.3d 1294, 1298 (3d Cir.1996)).

On the first issue – adversity – Defendants argue that Plaintiffs' claims are not ripe because "Defendants 'have taken no formal steps to compel compliance' with the examination[s] and the

10

costs of completing the examination[s] are not so substantial as to warrant judicial review." (*Siemens*, D.I. 12 at 5 (*quoting Marathon*, 876 F.3d at 485, 497) (other citations omitted)); *accord Eaton*, D.I. 15 at 7-8; *FOTL*, D.I. 16 at 7).  More specifically, Defendants assert that the examinations at issue here are ongoing because they have not yet requested or calculated Plaintiffs' ultimate escheat liability, issuing only "Interim" or "Preliminary" Reports.  (*Siemens*, D.I. 12 at 4-6; *accord Eaton*, D.I. 15 at 7-9; *FOTL*, D.I. 16 at 7-9).  Defendants further argue that Siemens' advance deposit "does not change this analysis because it is premature to make any determination that the entire deposit was not, in fact, owed, and Siemens – not the state – is the party in violation of the Letter Agreement."  (*Siemens*, D.I. 12 at 6).

Plaintiffs counter that the parties are indeed adverse because they "challenge Defendants' authority to audit . . . checks and credits Delaware cannot claim" under federal common law and the audits are sufficiently complete because the 2019 "reports identify all potential unclaimed property," "Defendants have indeed taken 'enforcement action' . . . by . . . terminating the expedited audit[s], thereby subjecting Plaintiffs to penalties, interest of 50%, half of which is mandatory, . . . and tolling the statute of limitations."  (*Siemens*, D.I. 14 at 5-6; *accord Eaton*, D.I. 20 at 4-7; *FOTL*, D.I. 17 at 5-8).  Siemens additionally asserts that its advance payment lends furthers adversity to its suit, as it is in the position of "seek[ing] a refund."  (*Siemens*, D.I. 14 at 6).

These cases present issues similar to those considered in the Third Circuit's decision in *Plains*, 866 F.3d 534, and this Court's opinion in *Univar*, 409 F. Supp. 3d 273.  In those cases, the plaintiff challenged aspects of the unclaimed property audit to which it was being subjected in Delaware.  Yet in both cases, the court found that there was no certainty that the plaintiff "w[ould] be subject to the challenged provisions of the audit."  *Univar*, 409 F. Supp. 3d at 280.  As this Court explained in the latter:

> [Although] the state has subpoenaed documents from [Univar] . . . and . . . filed suit in state court to compel compliance, Univar cannot actually meet the adversity prong of the ripeness test until it is actually compelled to participate in the audit. . . . Absent a ruling from the Chancery Court enforcing the [s]ubpoena, [Univar] is not yet compelled to comply with the document demands and unclaimed property audit and can thus not yet be subjected to the [a]udit. . . . Moreover, though the estimation methodology may now be set out in statute, the reality remains that any constitutional injury arising therefrom is contingent upon it actually being used against [Univar] to form the basis of an escheatment demand from [the defendants]. Such a situation remains contingent upon future events, and thus [Univar's] case is not distinguishable from *Plains*. Lastly, while it may later be found that a retroactive application of the UPL's newly-created subpoena power against a company for which an audit inquiry was opened prior to the amendment is unconstitutional, the reality remains that the [s]ubpoena at issue here has not yet been enforced against [Univar]. It is within the power of the Chancery Court to determine the enforceability. Should the Chancery Court rule in favor of Univar that the [s]ubpoena cannot be enforced, [Univar] remains in the same status as *Plains* and *Marathon*, where it is free to "simply refuse to cooperate." *Marathon*, 876 F.3d at 497.

*Id.* at 280-81. Thus, in both *Plains* and *Univar*, claims "directed to the way in which the audit process may be undertaken and what the ultimate result of that process may be" were deemed unripe. *Plains All Am. Pipeline, L.P. v. Cook*, 201 F. Supp. 3d 547, 556-59 (D. Del. 2016), *aff'd*, 866 F.3d at 540-44; *accord Univar*, 409 F. Supp. 3d at 280-81. Relevantly, this included claims for substantive due process and federal preemption based on the estimation provisions of Delaware's UPL.[5] *See, e.g.*, *Plains*, 866 F.3d at 540; *Univar*, 409 F. Supp. 3d at 280.

Plains and Univar thus indicate that Plaintiffs' claims for federal preemption and substantive due process – which are similarly based on the use of estimation and/or the UPL's estimation provisions – are also lacking in adversity. Nevertheless, Plaintiffs argue that *Univar*

---

[5]    In *Plains* and *Univar*, the unreasonable search and seizure claims based on the government's attempted review of the plaintiff's records were also deemed not to be ripe. Here, as discussed below, Plaintiffs' Fourth Amendment claims raise somewhat different issues than those in *Univar* and *Plains*.

and *Plains* are inapplicable here because: (1) Plaintiffs are challenging the audit process itself – *i.e.*, Delaware's authority to conduct the audit – rather than the scope of the audit or any aspects of the audit, which they assert is permitted under *Marathon* and *NE Hub*; (2) each audit has been ongoing for years; (3) each audit has reached a point where the amount Defendants can attempt to escheat is effectively set; and (4) each Plaintiff is now in the position of having to comply with the audit or be subject to penalty because they have been removed from the expedited process. (*See Eaton*, D.I. 20 at 4-7; *FOTL*, D.I. 17 at 5-8; *Siemens*, D.I. 14 at 4-6).

On the first point, Plaintiffs are correct that *Marathon* more obliquely and *NE Hub* more generally draw a distinction between claims challenging "the scope and intensity of the audit" and those assailing "Delaware's authority to conduct any audit at all" (*i.e.*, "process itself" challenges). The plaintiffs in *Marathon* alleged that the Delaware UPL "violates and is preempted by the federal common law . . . by authorizing the State Escheator to claim purported unclaimed property that Delaware lacks standing to claim under federal law" and the document requests made of them by the state amounted to an unreasonable search under the Fourth Amendment.  876 F.3d at 487.  To the extent those claims constituted a challenge to the "scope and intensity of the audit," the Third Circuit deemed them unripe for lack of adversity in accordance with *Plains*.  *Id.* at 496-98.  To the extent they constituted a challenge to "Delaware's authority to conduct any audit at all," however, the Third Circuit in *Marathon* deemed them distinguishable from *Plains*, reasoning that "[w]hen the claimed injury is the process itself, in the manner it is here, then the interests of the parties are clearly adverse" and "[i]f Delaware is not entitled to even ask . . . for more information, then the audit is effectively at an end."  *Id.* at 498-99 (citations omitted).

Plaintiffs, in their Complaints, however, do not challenge "the audit process itself" in the manner done in *Marathon*.  *Marathon* concerned a challenge to the state's power to "conduct any

13

audit at all" of certain companies, namely out-of-state subsidiaries of Delaware entities.  *Marathon Petroleum Corp. v. Cook*, 208 F. Supp. 3d 576, 579 (D. Del. 2016), *vacated by* 866 F.3d 534. When those claims reached the Third Circuit, the panel contrasted them with those in *Plains* on the basis that "the claim [in *Plains*] was not that 'Delaware lacks the authority to conduct its audit,'" 876 F.3d at 498-99 (quoting *Plains*, 866 F.3d at 542); rather, the plaintiff's preemption claim in *Plains* was "directed at the [UPL's] estimation provisions," 866 F.3d at 542.  Here, like in *Plains*, Plaintiffs challenge the UPL's estimation provisions.  (*Siemens*, D.I. 1 ¶ 73; *accord Eaton*, D.I. 1 ¶ 44; *FOTL*, D.I. 1 ¶ 86).  They additionally challenge Defendants' authority to audit certain of their records and to use those records as a basis for an estimation.  (*See Eaton*, D.I. 20 at 5 ("Plaintiffs challenge Defendants' authority to audit property Delaware cannot claim under [federal common law], even if it is abandoned, because owner addresses are in other states and Defendants cannot use them to estimate abandoned property escheatable to Delaware."); *FOTL*, D.I. 17 at 6; *Siemens*, D.I. 14 at 4-5).  They do not, however, challenge Defendants' authority to audit them generally or Defendants' authority to audit any of their entities.  In other words, like the plaintiff in *Plains* but unlike those in *Marathon*, Plaintiffs challenge only the scope of the audit to which they may be subjected, not whether they may be subject to any unclaimed property audit "at all."

As such, these are "scope and intensity" challenges under *Marathon*, not "process itself" or "auditing authority" challenges.  Thus, for the same reasons such claims were deemed insufficient in *Marathon*, *Plains*, and *Univar*, Plaintiffs' preemption and substantive due process claims are insufficient here – *i.e.*, Plaintiffs' challenges remain contingent upon future events that may not occur as anticipated or may not occur at all.  Defendants have not issued an administrative subpoena seeking compliance by Plaintiffs related to their audits, never mind sought enforcement

of such a subpoena in the Court of Chancery.  *See Univar*, 409 F. Supp. 3d at 280-81.  Thus, Plaintiffs are "not yet compelled to comply with the . . . unclaimed property audit[s] and thus not yet subjected to [them]."  *Id.*  Additionally, although Defendants have issued preliminary reports, they have made no escheatment demands of Plaintiffs to date, so any constitutional injury arising from the estimation methodology employed – even that set out in statute – "remains . . . contingent upon it being used against Plaintiff[s] to form the basis of an escheatment demand."  *Id.*  "Such a situation remains contingent upon future events, and thus [Plaintiffs'] case[s] [are] not distinguishable from *Plains*" or *Univar*.  *Id.* at 280-81.  Furthermore, although it may later be found that retroactive application of the UPL's new estimation, records retention, and foreign escheatment provisions and the corresponding regulations are unconstitutional, the reality remains that those provisions have not yet been enforced against Plaintiffs.  Thus, Plaintiffs remain "in the same stature" as those in *Plains*, *Marathon*, and *Univar*, "where [they are] free to 'simply refuse to cooperate.'"  *Id.* at 281 (quoting *Marathon*, 876 F.3d at 497).[6]

Plaintiffs' other arguments to the contrary – *i.e.*, based on the length of the audits, the stage of the audits, and the potential for penalties now that their audits are no longer being expedited – are unavailing.  The Third Circuit rejected all three in *Marathon*, noting that the "critical fact" is whether "formal steps" have been taken to compel cooperation.  *Id.* at 497 n.18 ("While there are factual differences between this case and *Plains*, for instance the fact that an audit has been ongoing for several years in this case and was in its infancy in *Plains*, those differences do not alter the critical fact that Delaware has as yet taken no formal steps to compel cooperation with its

---

[6]     The validity of Delaware's audit may "turn largely on" how it is ultimately, formally enforced, "and also on the question of who in fact is the holder of the property" attempted to be escheated or that forms the basis of any estimation, "suggesting that a decision at this time would be inconclusive and lacking in practical utility absent further development."  *See Marathon*, 876 F.3d at 497.

audit . . . ."); *see also id.* at 497 ("But at this point, Delaware has not even formally demanded compliance with the audit, so [the plaintiffs] are 'not yet in a place where they must choose between submitting to the audit or facing penalties.'" (quoting *Plains*, 866 F.3d at 542)); *id.* (vacating district court determination that "risk[ing] an 'enforcement action' and, potentially, large penalties," creates required adversity (*see Marathon*, 208 F. Supp. 3d at 582)).[7]

With regards to Siemens' additional argument that its advance payment establishes adversity, the issue is closer; however, the fact remains that Siemens' Complaint does not allege that Defendants have taken formal action to compel compliance by Siemens with an unclaimed property audit.  Siemens does not allege that it entered the Letter Agreement involuntarily.  It asserts that it had "no practical alternative but to enter into the confidential Letter Agreement," (*Siemens*, D.I. 1 ¶ 91), but that is not the same thing.  Before it entered the Letter Agreement, Siemens could have simply refused to cooperate.  It would be incongruous to allow Siemens to use that voluntary, albeit reluctant, cooperation to establish the necessary adversity now. Moreover, Siemens is not seeking return of its entire advance, only the amount in excess of the maximum Siemens alleges Defendants can recover based on the latest report from Kelmar. (*Siemens*, D.I. 1 ¶ 56).  As already noted, that report remains preliminary.  Thus, whether Siemens is entitled to a refund as well as the amount of any refund remains contingent upon the report "being used against [Siemens] to form the basis of an escheatment demand."  *Univar*, 409 F. Supp.

---

[7]     The Court understands Plaintiffs' concerns regarding penalties and interest, but any such costs additionally remain "potential" and "contingent on future events."  For example, how the State Escheator exercises its discretion, *see* 12 *Del. C.* § 1185(a), (c) (empowering State Escheator, for good cause, to waive, in whole or in part, all applicable penalties and up to 50% of applicable interest under § 1183 or § 1184 of the same title), the amount ultimately claimed by the state in any final calculation, *see id.* §§ 1183-84 (describing potential penalties and interests for escheatments, which are largely percentages of liability or segments of liability), and whether, when, and how the state attempts to formally enforce escheatment.

3d at 280-81. Therefore, from an adversity as well as a conclusiveness perspective, Siemens' advance payment does not alter whether its federal preemption and substantive due process claims are ripe. *See id.* at 281 (finding conclusiveness satisfied for other claims because "'future actions undertaken by the Delaware Defendants w[ould] have no impact'" on those claims (quoting *Plains*, 201 F. Supp. 3d at 556-59, *aff'd*, 866 F.3d at 540)).[8]

Turning to Plaintiffs' procedural due process and Fourth Amendment counts, the Court first notes that the courts in *Plains* and *Univar* found similar claims before them to be ripe.[9] *See Univar*, 409 F. Supp. 3d at 281; *Plains*, 201 F. Supp. 3d at 556-59, *aff'd*, 866 F.3d at 537, 540. In those cases, in addition to asserting the aforementioned unreasonable search and seizure, preemption, and substantive due process claims, the plaintiff asserted as-applied procedural due process claims based on the appointment of third-party contingent fee auditors to conduct the audits at issue and as-applied equal protection claims based on the targeting of large, wealthy companies. *E.g.*, *Plains*, 866 F.3d at 540; *Univar*, 409 F. Supp. 3d at 281-84; *Plains*, 201 F. Supp.

---

[8]     The Court notes that Defendants, in pointing out Siemens' voluntary entrance into the Letter Agreement, fail to acknowledge their (or their predecessors') roles in creating the situation Siemens now faces. It takes two to tango, and it took two to enter the Letter Agreement. Siemens allegations regarding Defendants' conduct in relation to the Letter Agreement are cause for concern. Defendants or their predecessors are accused of not only failing to comply with their own regulations in handling Siemens' request for a voluntary disclosure agreement in 2009, but then accepting millions of dollars from Siemens (whether self-estimated or not) in return for some of the same benefits to which Siemens would normally have been entitled under a voluntary disclosure agreement before waiting nearly a year to request any documents or information from Siemens. (*Siemens*, D.I. 1 ¶¶ 83-94, 98). From at least one perspective, that behavior raises a number of red flags.

[9]     In *Plains* and *Univar*, the procedural due process claims were found to be ripe, but the specific Fourth Amendment claims (based on unreasonable search and seizure of their records) made were not. Here, however, the Fourth Amendment claims asserted are based on different conduct, which has already occurred, and the rationale underlying the ripeness determination for the ripe claims in *Plains* and *Univar* applies to Plaintiffs' Fourth Amendment claim here.

3d at 560.  Regarding the procedural due process claims, the Third Circuit in *Plains* determined that adversity was satisfied "because the conduct being challenged by Plains [was] the appointment of Kelmar to conduct [the] audit, the harm alleged for [that] claim [was] not based on a contingency; it [was] based on conduct that ha[d] already occurred."  *Plains*, 866 F.3d at 545. Conclusiveness and utility were also satisfied because "[n]o further factual development [was] needed to address the merits of [the] claim, and a ruling on the merits would be 'useful to the parties and others who could be affected' given Delaware's widespread use of private auditors." *Id.* (quoting *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1470 (3d Cir. 1994)); *accord Univar*, 409 F. Supp. 3d at 281.  Regarding the equal protection claims, the *Plains* district court "explained that the initiation of the process provides conclusiveness and practical utility because 'future actions undertaken by the Delaware Defendants will have no impact on Plaintiff's equal protection claim' and 'there is some practical utility in assessing whether the targeting deprived Plaintiff of its constitutional rights.'"  *Univar*, 409 F. Supp. 3d at 281 (finding same and quoting *Plains*, 201 F. Supp. 3d at 558-59, *aff'd*, 866 F.3d at 538 n.2).

So too here, Plaintiffs assert procedural due process claims based on the State's employment of contingent-fee third-party auditors, a process that has not only been initiated in these cases but that has been occurring in each case for at least several years.  Similarly, Plaintiffs also base their Fourth Amendment and other procedural due process claims on harm(s) that have already occurred – the asserted lack of "pre-enforcement review of Defendants' termination of Plaintiffs' expedited audit election[s]" (which, as noted, differs from the Fourth Amendment claims in *Univar* and *Plains*, which both concerned search and seizure of the plaintiff's records, which had not yet occurred). (*See Siemens*, D.I. 1 ¶¶ 73, 163-77; *accord Eaton*, D.I. 1 ¶¶ 180-93; *FOTL*, D.I. 1 ¶¶ 162-75)  Thus, like the claims deemed ripe in *Univar* and *Plains*, the parties are

18

sufficiently adverse for purposes of Plaintiffs' procedural due process and Fourth Amendment claims.  For the same reason, future actions by Defendants are unlikely to impact the claims and a ruling on the merits would be useful to the parties and others given Delaware's apparent widespread early termination of expedited audits without pre-enforcement review; thus, conclusiveness and utility are also satisfied.

For the forgoing reasons, the Court finds that Plaintiffs' claims arising under procedural due process and regarding "pre-enforcement review of Defendants' termination of Plaintiffs' expedited audit election[s]" (Counts III and IV of each suit) are ripe, but their substantive due process and preemption claims (Counts I and II of each suit) are not.

### 2.      Failure to State a Claim

Having found that Plaintiffs' procedural due process and Fourth Amendment claims are ripe for review, the Court now turns to whether Plaintiffs have sufficiently pleaded those claims. Defendants challenge Siemens' claims against the State of Delaware on the grounds of sovereign immunity[10] and challenge all claims against all Defendants as insufficiently pleaded.  (*Eaton*, D.I. 15 at 1-2; *FOTL*, D.I. 16 at 1-2; *Siemens*, D.I. 12 at 3).  The Court considers each argument in turn.

### a.      All Claims Against the State of Delaware – Sovereign Immunity

The states of this country "possess immunity from suit in the federal courts, also known as Eleventh Amendment immunity."  *Lombardo v. Pennsylvania Dep't of Public Welfare*, 540 F.3d 190, 194-95 (3d Cir. 2008) (tracing history of state sovereign immunity in the United States).  The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by

---

[10]      As previously noted, only Siemens has included the State as a defendant.

Citizens of another State, or by Citizens or subjects of any Foreign State." Thus, by its terms, the Eleventh Amendment bars suits against states in federal court. *E.g.*, *Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 551 F.3d 193, 197 (3d Cir. 2008). The Supreme Court has additionally and consistently clarified that it extends to suits against a state by its own citizens. *Edelman v. Jordan*, 415 U.S. 651, 662-64 (1974), *overruled on other grounds by Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989); *accord Lombardo*, 540 F.3d at 194 (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)). Furthermore, the Eleventh Amendment "is but one particular exemplification of [the States' sovereign] immunity." *Lombardo*, 540 F.3d at 195 (quoting *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 753 (2002)). In truth, states are immune from suit as well as liability in federal courts. *Id.* (citing *Fed. Mar. Comm'n*, 535 U.S. at 766; *Dellmuth v. Muth*, 491 U.S. 223, 229 (1989); *Edelman*, 415 U.S. at 662-64).

This immunity, however, "is not absolute," *Lombardo*, 540 F.3d at 195, and there are "three narrowly circumscribed exceptions": (a) "abrogation by Act of Congress"; (b) "suits against individual state officials for prospective relief to remedy an ongoing violation of federal law"; and (c) "waiver by state consent to suit," *M.A. ex rel. E.S. v. State-Operated Sch. Dist. of City of Newark*, 344 F.3d 335, 344-45 (3d Cir. 2003) (citing *MCI Telecomms. Corp. v. Bell Atlantic-Pa. Serv.*, 271 F.3d 491, 503 (3d Cir. 2001)). Thus, the question for the Court is whether any of the exceptions apply.

Defendants argue no exceptions apply "because [the Siemens] Plaintiffs' claims depend on state law," and "[t]he State has not waived sovereign immunity" except perhaps for suits against the State Escheator in the Delaware Court of Chancery. (*Siemens*, D.I. 12 at 8). Siemens responds that an exception does apply because "the gravamen of all [its] claims is federal preemption" and "'[t]he Eleventh Amendment does not preclude lawsuits against state officials in their official

20

capacities to enjoin violations of federal law even where the remedy would enjoin enforcement and implementation of an official state policy.'" (*Siemens*, D.I. 14 at 8-9 (quoting *Am. Ex. Travel Related Servs. Co., Inc. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556, 568 (D.N.J. 2010))).  Siemens also argues that sovereign immunity does not apply because it "claim[s] a return of [its] own property," which the UPL and Letter Agreement both authorize.  (*Id.*).

First, neither side argues – and there is no indication – that any Act of Congress abrogates the States' sovereign immunity with respect to the claims Siemens asserts.

Second, as already mentioned, Defendants do not seek dismissal of the claims against the Individual Defendants, just those against the State.  (D.I. 11 at 1; 12 at 8-9).  Additionally, the Eleventh Amendment applies regardless of the subject matter jurisdiction basis of the case in federal court.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 120-21 (1984).  Thus, both Siemens' and Defendants' first arguments do not address the issue.

Third, the State has not waived its sovereign immunity in federal court with respect to the claims at issue.  "[W]aiver by the state must be voluntary and our test for determining voluntariness is a stringent one."  *MCI Telecomm.*, 271 F.3d at 503-04.  "The state either must voluntarily invoke [federal] jurisdiction by bringing suit (not the case here) or must make a 'clear declaration that it intends to submit itself to [federal] jurisdiction.'"  *Id.* (quoting *College Savs. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999)); *accord Patel v. Crist*, C.A. No. 19-9232, 2020 WL 64618, at *3 (D.N.J. Jan. 7, 2020).  Yet neither the provisions of the UPL to which Siemens cites nor the Letter Agreement provide such a clear declaration.

Siemens cites to sections 1166(a) and 1179(b) of the UPL.  (D.I. 14 at 8).  The former, however, applies to "claim[s] for property" by "the owner of the [unclaimed] property."  12 *Del. C.* § 1166(a).  The amount Siemens seeks to have refunded is not "unclaimed property" under the

UPL, but an advance payment made against its potential escheat liability.  Moreover, even if it were unclaimed property, Siemens is not the "owner" but the "holder."  *See id.* § 1130(9), (16) (defining "Holder" and "Owner").  As for § 1179(b), that passage states, in total:

> Not later than 90 days after the State Escheator mails a statement of findings, the holder [of unclaimed property] may do any of the following:
>
> (1) File an action against the State Escheator in the Court of Chancery challenging the State Escheator's determination of liability and seeking a declaration that the determination is unenforceable, in whole or in part.
>
> (2) Pay the amount or deliver the property determined by the State Escheator to be paid or delivered to the State Escheator and file an action against the State Escheator in the Court of Chancery for a refund of all or part of the amount paid or return of all or part of the property delivered.

That is not a blanket statement of waiver.  It is a narrow provision that calls out both the court and official to whom waiver might apply.  It does not mention federal jurisdiction nor otherwise provide any indication that the State intended to waive its sovereign immunity in federal court, let alone provide the necessary "clear declaration" of such intent.

Similarly, Siemens has not pointed to and the Court cannot discern any aspect of the Letter Agreement that would function as a waiver of the State's federal court sovereign immunity.  In its brief, Siemens cites paragraphs in its Complaint that explain the contents of the Letter Agreement, yet nothing that substantiates its waiver claim.  (D.I. 14 at 8 (citing D.I. 1 ¶¶ 4, 5, 92)).  The Letter Agreement does "expressly reserve[]" to Siemens "all rights to challenge any deficiency assessed by Delaware," (D.I. 13, Ex. A § 7), but it does not increase those rights beyond those afforded to Siemens via the UPL nor clearly waive any aspect of the State's federal court sovereign immunity.

As none of the exceptions to sovereign immunity apply, the State of Delaware is entitled to dismissal of all claims against it.

b.     Procedural Due Process Claims – Failure to State a Claim

Defendants next move to dismiss Plaintiffs' procedural due process claims for failure to state a claim.  (*Eaton*, D.I. 15 at 16-18; *FOTL*, D.I. 16 at 16-19; *Siemens*, D.I. 12 at 15-17). Plaintiffs each assert two such claims – one based on the appointment of third-party auditors on a contingent-fee basis and a second based on the lack of pre-enforcement review before an audited party's expedition election may be terminated by the State Escheator.  (*See Eaton*, D.I. 1 ¶¶ 180-85; *FOTL*, D.I. 1 ¶¶ 162-67; *Siemens*, D.I. 1 ¶¶ 163-69).  The Court considers each in turn.

i.     *Appointment of Third-Party Auditors*

To make a procedural due process claim, a plaintiff "must allege that [it] w[as] deprived of an interest 'encompassed within the Fourteenth Amendment's protection of "life, liberty, or property,"' and that available procedures 'did not provide "due process of law."'"  *Ass'n of N.J. Rifle and Pistol Clubs v. Governor of New Jersey*, 707 F.3d 238, 240 (3d Cir. 2013) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006)).  As the Third Circuit noted in *Plains*, however, in circumstances like these "all [plaintiffs] must show is that [they] w[ere] required to submit a dispute to a self-interested party."  *Plains*, 866 F.3d at 545 (citing *Carey v. Piphus*, 435 U.S. 247, 266 (1978); *United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982)).  Here, the Complaints do so.  (*See, e.g.*, *Eaton*, D.I. 1 ¶¶ 42, 76, 183-84; *FOTL*, D.I. 1 ¶¶ 34, 63, 165-66; *Siemens*, D.I. 1 ¶¶ 55, 97, 167-68).

Nevertheless, Defendants make two arguments why these claims fail as a matter of law: (1) because the third-party auditors are not judges and the allegations of self-interest are conclusory; and (2) because the pay of the third-party auditors involved here are no longer or not alleged to be contingent on the total amount recovered.  (*Eaton*, D.I. 15 at 18; *FOTL*, D.I. 16 at 17-19; *Siemens*, D.I. 12 at 16-17).

23

Defendants' first argument may be more fully explicated as the following: third-party auditors are more akin to prosecutors or civil plaintiffs than judges or adjudicators because they hear no witnesses, rule on no disputed factual or legal question(s), and make no final determinations of liability, and a holder may challenge any determination of liability in the Court of Chancery. (*Eaton*, D.I. 15 at 18; *FOTL*, D.I. 16 at 17-19; *Siemens*, D.I. 12 at 16-17). Defendants, however, made the same arguments in *Univar*, and this Court rejected them. *See* 409 F. Supp. 3d at 282-83.

The same concerns and issues that drove that portion of the *Univar* decision predominate here as well. Defendants' comparison of third-party unclaimed property auditors to prosecutors or civil plaintiffs is "unavailing" because Plaintiffs each contend that such auditors in Delaware are involved in the escheat process from the selection of targets through determination of ultimate liability, (*e.g.*, *Eaton*, D.I. 1 ¶¶ 101-147, 184; *FOTL*, D.I. 1 ¶¶ 99-134, 166; *Siemens*, D.I. 1 ¶¶ 28, 61, 66, 95-129, 168), and are compensated based on the total amount collected, (*Eaton*, D.I. 1 ¶¶ 42, 183; *FOTL*, D.I. 1 ¶¶ 1, 34, 165; *Siemens*, D.I. 1 ¶¶ 96, 167). *See Univar*, 409 F. Supp. 3d at 282. Thus, as in *Univar*, Plaintiffs have each alleged that the outside auditors have a "vested interest in drawing out [the] audit[s] . . . and increasing the total unclaimed property given [their] contingency-based pay structure." 409 F. Supp. at 282-83. Furthermore, despite its control over any final determination of liability, the State Escheator remains as free to "rely solely" on the auditors' final reports as it is to "make its own determinations"; thus, "[d]iscovery from [] Defendants, of course, would clarify whether [the third-party auditors are] purely providing [] suggestions[s] to the State Escheator that [are] then rigorously reviewed or [are] instead rubber-stamped, as alleged." *Univar*, 409 F. Supp. 3d at 282-83. "That the la[t]ter could be true, and that a targeted company has no opportunity to contest the finding of [a third party auditor's]

determination prior to the State Escheator's demand further bolsters the Court's finding that Plaintiff[s] ha[ve] stated [] claims  upon which relief may be granted."  *Id.*

Finally, "[a]t this stage, without engaging in a full examination of Delaware's UPL statutory language, it suffices to say that it is not clear to the Court that an uncontestable report to the State Escheator and future, limited judicial appeal meet the Supreme Court's requirement of a *de novo* review of *all factual and legal issues* that would relieve the Defendants of the appearance that a self-interested party has significant control over the audit process and unclaimed property determination."  *Id.* (referencing *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 618 (1993)).[11]

As for Defendants' second argument, relating specifically to the pay structures of the auditors involved here, Kelmar and IAG, Defendants argue for dismissal because FOTL does not allege that IAG (conducting its audit) "has ever been paid or is currently contractually obligated to be paid on a contingency fee basis," (*FOTL*, D.I. 16 at 18-19), whereas Kelmar (conducting the Eaton and Siemens audits) is, according to a new contract[12] signed December 31, 2019, paid an hourly rate rather than a contingent fee.  (*Eaton*, D.I. 15 at 18; *Siemens*, D.I. 12 at 16).

---

[11]     "In the appeal to the Court of Chancery, the Court, when factual determinations are at issue, shall take due account of the experience and specialized competence of the State Escheator and of the purposes of the basic law under which the State Escheator has acted.  The Court's review shall be limited to a determination of whether the statement of findings and request for payment was the product of an orderly and logical deductive process rationally supported by substantial, competent evidence on the hearing record."  12 *Del. C.* § 1179(d) *accord Univar*, 409 F. Supp. 3d at 283 n.4 (quoting same).  Although, as Defendants argued in *Univar*, this may be the same standard of review to which Delaware trial courts are subject to on appeal, the fact remains that "before a challenge to the Court of Chancery, the Escheats Law provides no adversarial review."  *Univar*, 409 F. Supp. 3d at 283 n.4.

[12]     The Court assumes without deciding that it can look at the new Kelmar contract at this stage.

The argument regarding IAG's fee structure is insufficient, however, because, as Defendants admit, neither the UPL nor Delaware's related regulations prohibit contingent fees, (*e.g.*, *FOTL*, D.I. 16 at 17-18 n.11 (citing 12 *Del. C.* § 1178(a) and related regulations), and FOTL alleges that "Defendants rely on the use of contingent fee auditors whose financial self-interest influenced the result of the audit" and that IAG is "the contractor conducting [its] audit." (*FOTL*, D.I. 1 ¶¶ 34, 165). That is enough at this stage.

The argument regarding Kelmar's new contract is also unavailing because it is a mootness argument and there is no indication that the constitutionality of contingent fee auditors in Delaware unclaimed property audits is moot.

In arguing that Kelmar's new contract obviates Eaton and Siemens' claims, Defendants are essentially arguing that circumstances have changed such that the actual or threatened injury from the challenged practice (improperly high escheat liability from contingent fee-based third-party auditing) no longer exists. That is a mootness challenge. *E.g.*, *Del. Audobon Soc., Inc. v. Sec'y of United States Dep't of Interior*, 612 F. Supp. 2d 442, 447 (D. Del. 2009) (citing *Mills v. Green*, 159 U.S. 651, 653 (1985)). "It is well settled" however, "that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). "'If it did, the courts would be compelled to leave "the defendant free to return to his old ways."'" *Id.* (quoting *City of Mesquite*, 455 U.S. at 289 n.10 (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953))); *accord Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 306-7 (3d Cir. 2020).

Thus, a defendant's unilateral cessation of a challenged activity after a suit has been filed – also known as "voluntary cessation" – "'will only moot a case if it is "absolutely clear that the

26

allegedly wrongful behavior could not reasonably be expected to recur.""" *Hartnett*, 963 F.3d at 307 (quoting *Fields v. Speaker of the Pa. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019) (quoting *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007))); *accord Friends of the Earth*, 528 U.S. at 189-91. In making such a determination, "a court must consider 'the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations.'" *Del. Audobon*, 612 F. Supp. 2d at 448 (quoting *W.T. Grant*, 345 U.S. at 633). The "touchstone" of this analysis is "not how willingly the defendant changed course," but "whether the defendant made that change unilaterally and so may 'return to its old ways' later on." *Hartnett*, 963 F.3d at 307 (quoting *Friends of the Earth*, 528 U.S. at 189 (quoting *City of Mesquite*, 455 U.S. at 289 n.10)). The "heavy" burden of persuading the Court that the ceased conduct will not recur is Defendants'. *Id.* at 306-07 (citing *Friends of the Earth*, 528 U.S. at 189).

Here, Defendants have not expressed any intent to cease compensating third-party auditors based on the amount recovered, nor any indication that the new restrictions will be permanent, ubiquitous, or effective. Moreover, the character of Defendants' past violations and current actions leaves the Court with doubts as to Defendants' commitment to ending the practice. First, Kelmar's fee structure is set by contract, not law, and Defendants admit that the UPL and applicable regulations still allow for contingent-fee arrangements. Thus, the contract could presumably be altered in the future if the parties so wish. Second, there is no indication that Defendants intend to remove contingent fee arrangements from all third-party auditor contracts. This is highlighted by the facts that, by law, Kelmar's contract only applies to – at most – half of all unclaimed property audits in Delaware, 12 *Del. C.* § 1178(a), and that there has been no argument from Defendants that IAG is subject to a similar payment structure. Third, Defendants continue to defend the

practice of contingent fee arrangements for unclaimed property audits.  (*See, e.g.*, *Eaton*, D.I. 21 at 8-9 & n.7-9 (arguing propriety of employing contingent fee auditors for unclaimed property audits); *FOTL*, D.I. 16 at 17-18 & n.11-13 (same); *Siemens*, D.I. 12 at 16 n.7 (same)).  Finally, the timing of the new Kelmar contract, coming just a few weeks after these and one other suit challenging Delaware's contingent fee practice were filed[13] and only a little more than a month before the instant motions to dismiss were submitted,[14] "strongly suggests that the impending litigation was the cause of the [change] and, given the continued defense of the [practice] in question," never mind the state of the law, "there [is] no assurance that [Defendants] w[ill] not enter into a [relationship] similar to [that being challenged] in the future."  *Marcavage v. Nat'l Park Serv.*, 666 F.3d 856, 861 (3d Cir. 2012) (describing *United States v. Gov't of the Virgin Islands*, 363 F.3d 276, 285 (3d Cir. 2004)).  Thus, to the extent Defendants argue that Kelmar's new fee arrangement obviates Eaton and Siemens' procedural due process claims based on the State's enlistment of contingent-fee auditors, the Court disagrees.

For the above reasons, the Court is satisfied that Plaintiffs' contentions and supporting claims are sufficient to state procedural due process claims that Plaintiffs must submit to non-neutral adjudicators for their unclaimed property audits.

### ii. Pre-Termination Review of Election to Expedite

As with their other procedural due process claims, to succeed on their procedural due process claims based on the lack of review before expedited audit elections are terminated,

---

[13]     (*Eaton*, D.I. 1 (filed December 12, 2019); *FOTL*, D.I. 1 (filed December 13, 2019); *Siemens*, D.I. 1 (filed December 17, 2019)); *AT&T Capital Servs. Inc. v. Geisenberger, et al.*, C.A. No. 19-2238-MN, D.I. 1 (filed Dec. 6, 2019).

[14]     (*Eaton*, D.I. 14 (filed January 23, 2020); *FOTL*, D.I. 15 (filed January 30, 2020); *Siemens*, D.I. 11 (filed February 11, 2020)).

Plaintiffs "must allege that they were deprived of an interest 'encompassed within the Fourteenth Amendment's protection of "life, liberty, or property,"' and that available procedures 'did not provide "due process of law."'" *Ass'n of N.J. Rifle and Pistol Clubs*, 707 F.3d at 240 (quoting *Hill*, 455 F.3d at 233-34).  Here, Plaintiffs rely on their interest in expediting their unclaimed property audits.  (*Eaton*, D.I. 1 ¶ 182; *FOTL*, D.I. 1 ¶ 164; *Siemens*, D.I. 1 ¶ 166).  Defendants argue that interest is not enough, however, because Plaintiffs lack a "fundamental property interest" in an expedited examination.  (*Eaton*, D.I. 15 at 16-17; *FOTL*, D.I. 16 at 16-17; *Siemens*, D.I. 12 at 15-16).

The Supreme Court has instructed that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."  *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (citations omitted); *accord Ferrone v. Onorato*, 298 F. App'x 138, 139-40 (3d Cir. 2008).  Title 12, § 1172(c)(1) of the Delaware Code allows persons whose unclaimed property audit was authorized before February 2, 2017 to "notify the State Escheator" of an "intent to expedite the completion of the pending examination."  If sufficient notice is tendered and the person under examination "responds within the time and in the manner established by the State Escheator to all requests for records, testimony, and information," the State Escheator is obligated to "complete the examination and provide a [final] examination report . . . within 2 years from the date of receipt of the . . . notification and [to] waive interest and penalty."  *Id.* § 1172(c)(2).  The UPL further states, however, that "[t]he determination whether the person has responded within the time and in the manner established and a resulting determination to terminate expediting the person's examination under this subsection if the person has not, *shall be within the complete discretion* of the State Escheator and subject only to the review of the Secretary of Finance."  *Id.* § 1172(c)(4) (emphasis added).

Plaintiffs argue that the State Escheator nevertheless lacks discretion because it may only terminate the expedited audit if the expediting party fails to respond as requested. (*Eaton*, D.I. 20 at 17-18 & n.10; *FOTL*, D.I. 17 at 19-20; *Siemens*, D.I. 14 at 17-18). They further assert that the Court's calculus is altered because they each responded fully to all requests before electing to expedite and Defendants lack authority to force Plaintiffs to defend against abandonment or to remediate. *Id.* Whatever the merits of those statements, however, they are irrelevant to the inquiry here. The question is whether the benefit of expedited review is a protected entitlement over which Plaintiffs may assert procedural due process claims. *See Town of Castle Rock, Colo*, 545 U.S. at 756. More specifically, it is the extent of discretion afforded to government officials over that benefit. *Id.* Given the explicit "complete discretion" afforded the State Escheator and Secretary of Finance, it is clear that the benefit of an expedited audit under the Delaware UPL is not a protected entitlement to which procedural due process may apply.[15]

Siemens additionally asserts that it possesses the necessary property interest because it is purportedly being deprived of the difference between what it paid as an advance deposit and what it alleges is its maximum escheat liability. (*Siemens*, D.I. 14 at 17). Yet it is unclear to the Court how deprivation of that amount relates to this claim. This claim is based on Defendants' decision to terminate expediting Siemens' audit, not any purported seizure of that portion of Siemens' deposit. (*See id.*, D.I. 1 ¶ 166). Nor is there any substantive argument to that effect in Siemens' Answering Brief, as Siemens devotes one conclusory sentence to the issue. (*Siemens*, D.I. 14 at

---

[15]    *See Ferrone*, 298 F. App'x at 139-40 & n.2 (finding plaintiff lacked "a protected property interest in . . . loan funds as a government benefit" because government entity had "discretion to grant or deny disbursement of funds" where said entity was empowered to "determine, in its *sole but reasonable discretion*, whether the requisition [was] in the form required" (emphasis added)).

17).[16]  Given all that, the Court cannot conclude that Siemens derives the necessary property interest for this procedural due process claim from its advance payment.

Thus, the Court finds that Plaintiffs have failed to state procedural due process claims based on a lack of review before an expedition election is terminated for failure to respond within the time and in the manner established to all requests for records, testimony, and information.

c.      Fourth Amendment Claims – Failure to State a Claim

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  Plaintiffs complain that the UPL "facially violates the Fourth Amendment" because it "does not provide for pre-enforcement review of Defendants' termination of an expedite audit election."  (*Eaton*, D.I. 1 ¶ 192; *accord FOTL*, D.I. 1 ¶ 174; *Siemens*, D.I. 1 ¶ 176).  Defendants argue that these allegations are insufficient.  (*Eaton*, D.I. 15 at 18-20; *FOTL*, D.I. 16 at 19-20; *Siemens*, D.I. 12 at 17-19).

It is a bit unclear to the Court whether Plaintiffs assert a claim for "search" or "seizure." *See Mitan v. United States Postal Inspection Serv.*, 656 F. App'x 610, 615 n.6 (3d Cir. 2016) (describing how "[t]he Fourth Amendment 'protects two types of expectations, one involving "searches," the other "seizures,"'" which require different analyses (citations omitted)).  The claims and Defendants' briefs suggest Plaintiffs might protest the UPL's allowance of a "seizure" of a party's interest in expediting an unclaimed property audit, yet Plaintiffs' Answers indicate

---

[16]      For example, Siemens does not address whether the Letter Agreement or UPL governs handling of that money (the Letter Agreement was superseded, at least in part, when Siemens expedited its audit, (*Siemens*, D.I. 1 ¶ 106)).  If the Letter Agreement still governs, "rights arising under state contract . . . are not constitutionally protected except in two limited circumstances: (1) the contract confers a protected status; or (2) the agreement is terminable by the state actor only for cause," *Ferrone*, 298 F. App'x at 140 (citations omitted), and there is no indication or argument that this is one of those circumstances.

that the issue is a "search" in the form of an "unauthorized audit."  Considering the ambiguity, the Court examines both theories.

To the extent Plaintiffs assert claims for "seizure" of expediting audit elections, those fail because expediting parties lack a possessory interest in that election.  As with the procedural due process claims already discussed, it is axiomatic that a Fourth Amendment claim requires the purportedly injured party to have some level of property or possessory interest in the thing seized or searched.  "[A] seizure of property [only] occurs . . . when there is some meaningful interference with an individual's possessory interest in that property." *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012) (citations omitted); *accord Mitan*, 656 F. App'x at 616 n.6 (3d Cir. 2016) (same (quoting *United States v. Jacobsen*, 466 U.S. 109, 113, (1984)). *Cf. City of Los Angeles v. Patel*, 576 U.S. 409, 414 (2015) (noting, in case of "search," that circuit court "first determined" whether action underlying facial Fourth Amendment challenge was "a Fourth Amendment 'search'").  As a magistrate in one of our sister courts has explained:

> A property or possessory interest for Fourth Amendment purposes has not been expressly defined, but the federal courts have applied several general standards in making this determination. The United States Supreme Court declined to find a Fourth Amendment possessory interest in an item when "neither ownership nor possession" of the item was shown. *United States v. Miller*, 425 U.S. 435, 440 (1976)[, *superseded in part by statute on other grounds*, *see, e.g.*, *Ferrone v. Onorato*, C.A. No. 05-0484, 2006 WL 8456842, at *10 & n.4 (W.D. Pa. May 26, 2006)]. The Court of Appeals for the Third Circuit has held that substantial control, unfettered access, and actual possession over an item creates a possessory interest that is protected by the Fourth Amendment. *See* [*United States v.*] *Baker*, 221 F.3d [438,] 443 [(3d Cir. 2000)]. Finally, a Fourth Amendment possessory interest has been described as follows: "while outright ownership is not required[,] there must be 'clear evidence of continuing possession and control, as well as no evidence that the defendant obtained the item illegitimately.'" *United States v. Ryan*, 128 F. Supp. 2d 232, 235 (E.D. Pa. 2000), citing *United States v. Baker*, 221 F.3d 438, 443 (3d Cir. 2000).

*Ferrone*, 2006 WL 8456842, at *10 (report and recommendation to which this point was not objected, *see id.*, 2006 WL 8456841, at *1 n.3 (W.D. Pa. June 29, 2006)).

Additionally, the Supreme Court has instructed that "when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant." *City of Los Angeles*, 576 U.S. at 418. Although searches and seizures are analyzed differently, the difference is in the "interest" that is analyzed – *i.e.*, "possessory" interest for "seizure" or "privacy" interest for "search." *See, e.g.*, *Mitan*, 656 F. App'x at 616 n.6 (citations omitted). Thus, the Supreme Court's sentiment appears equally applicable to seizures. Therefore, to state a facial claim here, Plaintiffs must allege facts sufficient to cause the inference that, in seizures that the UPL actually authorizes, the target of the seizure has outright ownership or possession of; legitimate and continuing possession and control of; or substantial control of and unfettered access to the property at issue – the election to expedite.

Such an inference is not supported. As explained, once a party elects to expedite an audit, the Delaware State Escheator, subject to review by the Delaware Secretary of Finance, maintains "complete discretion" to determine whether a party has complied with the requirements of an expedited audit and to determine whether to terminate expediting a party's examination if it determines the party has not. 12 *Del. C.* § 1172(c)(4). Expediting parties have no role in that decision. Given that such discretion is reserved to state officials from the outset, Plaintiffs have not alleged facts sufficient to enable the inference that expediting parties have possession, ownership, or control of, unfettered access to, or any other possessory interest in an expedite election.

Siemens' advance payment does not change this conclusion.  (*Siemens*, D.I. 14 at 18-19). Setting aside that Siemens' payment appears more apt for an as-applied challenge given its uniqueness; as already explained *supra*, it is also unclear to the Court how that payment relates to claims that, like this one, are based on Defendants' decision to terminate expediting Siemens' audit rather than any purported seizure of Siemens' deposit.  Nor does Siemens' provide a fulsome explication of that theory, again devoting only a few words to the issue.  (*Siemens*, D.I. 14 at 18-19).  Given all that, the Court cannot conclude that Siemens derives the necessary property interest for a Fourth Amendment seizure claim from its advance payment.

To the extent Plaintiffs assert claims for "search" based on the theory that they are being penalized for failing to comply with the audits by having their expedite elections terminated, those also fail because loss of an expedite election under the UPL is not a "penalty" for Fourth Amendment purposes.  Plaintiffs rely on *City of Los Angeles, California v. Patel* in their briefs, which held, in relevant part, that a "provision of the Los Angeles Municipal Code that require[d] hotel operators to make their registries available to the police on demand [was] facially unconstitutional because it penalize[d] them for declining to turn over their records without affording them any opportunity for precompliance review."  576 U.S. at 412.  Under the relevant provision, "[a] hotel owner who refuse[d] to give an officer access to his or her registry [could] be arrested on the spot."  *Id.* at 421.  Plaintiffs also point to cases where the Sixth and Eleventh Circuits deemed civil citations sufficient penalty to implicate the Fourth Amendment.  *See McLaughlin v. Kings Island, Div. of Taft Broad. Co.,* 849 F.2d 990, 996-97 (6th Cir. 1988); *Brock v. Emerson Elec. Co., Elec. & Space Div.*, 834 F.2d 994, 997 (11th Cir. 1987).  The purported "penalty" here, however, is substantially different than those in *City of Los Angeles*, *McLaughlin*, and *Brock*.

It is not the loss of something to which an expediting party possesses a right, such as liberty or property (*e.g.*, money), nor is it a reprimand akin to a civil citation. Instead, as explained, it is the loss of a benefit for which audited parties have no property or other possessory interest. Eligible parties are not required to expedite their audits. To do so is a choice, and the benefit received by expediting parties is limited in several ways, including by the "complete discretion" afforded to state officials to decide whether expediting parties are complying with requests and to terminate expediting the audit if the state officials determine they are not. Under the UPL, Defendants are only empowered to penalize a party for failing to comply with an audit if they issue an administrative subpoena seeking such compliance. The UPL, however, also contains a mechanism, *see* 12 *Del. C.* § 1171(3)-(4), for challenging administrative subpoenas in Delaware's Court of Chancery. That satisfies the requirement of "an opportunity to obtain precompliance review before a neutral decisionmaker." *City of Los Angeles*, 576 U.S. at 421-22. Siemens' advance deposit does not change this calculus, as it was made voluntarily, they have not yet been "deprived" of it, and the agreement pertaining to it does not impact the aforementioned discretion.

For the foregoing reasons, the Court concludes that Plaintiffs have failed to state Fourth Amendment seizure or search claims based on termination of the expedited status of their audits.

## III.   **PRELIMINARY INJUNCTIONS**

As Plaintiffs' procedural due process claims for use of self-interested third-party auditors remain, the Court now turns to Plaintiffs' motions for preliminary injunctions. Eaton, FOTL, and Siemens all seek, pursuant to Federal Rule of Civil Procedure 65, "to enjoin Defendants from enforcing their audit[s], . . . until a final ruling on the merits of [their] claims." (*Eaton*, D.I. 28 at

2; *accord FOTL*, D.I. 25 at 2; *Siemens*, D.I. 23 at 2).  The motions will be denied because Plaintiffs have failed to establish irreparable harm.

### A.    <u>Legal Standards</u>

"Preliminary injunctive relief is 'an extraordinary' remedy'" appropriate "'only in limited circumstances.'"   *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)). "It may be granted only when the moving party shows '(1) a likelihood of success on the merits; (2) that the movant will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.'"   *Doe by and through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018) (quoting *Kos*, 369 F.3d at 708); *accord Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  Movants face a "heavy burden," *Lane v. New Jersey*, 753 F. App'x. 129, 131 (3d. Cir. 2018) (citations omitted), and must establish entitlement to relief by "clear evidence," *Boyertown Area Sch. Dist.*, 897 F.3d at 526.  *See also Winter*, 555 U.S. at 22. Failure to establish any of the elements, but particularly either of the first two, renders preliminary injunctive relief "inappropriate."   *See Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 319 (quoting *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)).

### B.    <u>Irreparable Harm</u>

To obtain a preliminary injunction, a plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (2008); *accord Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 142 (3d Cir. 2017).  "'The relevant inquiry is whether, at the time the injunctive relief is to be issued, the party seeking the injunction is in danger of suffering irreparable

harm.'  The irreparable harm alleged must be actual and imminent, not merely speculative." *Shabazz v. Delaware Dep't of Corr.*, C.A. No. 16-570-RGA, 2020 WL 998541, at *2 (Mar. 2, 2020) (citing *Friends of the Earth*, 528 U.S. at 180-81).  A purely economic injury, compensable in money, cannot satisfy this requirement, unless the potential economic loss is so great that it threatens to cause an injury that cannot be righted with money alone.  *See, e.g.*, *Minard Run Oil Co. v. United States Forest Service*, 670 F.3d 236, 255 (3d Cir. 2011) (citations omitted) ("[A]n exception exists [to general rule] where the potential economic loss is so great as to threaten the existence of the movant's business."); *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994) ("[T]he injury . . . must be of such a peculiar nature, so that compensation in money alone cannot atone for it." (citations omitted)); *Doran v. Salem Inn*, 422 U.S. 922, 932 (1975) (finding irreparable harm shown where movant's business "would suffer a substantial loss of business and perhaps even bankruptcy" absent injunctive relief).  In short, "[t]he preliminary injunction must be the only way of protecting the plaintiff from harm." *Shabazz*, 2020 WL 998541, at *2 (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.3d 797, 801 (3d Cir. 1989)).

Additionally, Plaintiffs must present evidence of the injuries suffered or impending – argument paired with conclusory allegations alone is insufficient.  *See, e.g.*, *Boyer v. Taylor*, C.A. No. 06-694-GMS, 2012 WL 1132786, at *3 (D. Del. March 30, 2013) ("The plaintiffs allege in a conclusory manner that the failure to issue injunctive relief could result in death or severe illness. The plaintiffs provide argument, but no evidence, in support . . . [Thus, t]he plaintiffs fail to meet the requisites for injunctive relief."); *see also In Re Revel AC*, 802 F.3d 558, 572 (3d Cir. 2015) (noting, in bankruptcy context, "the adequacy of the proof provided plays an important role in evaluating the harm that will occur depending on whether or not a stay is granted") (citations omitted)).

Here, Plaintiffs argue that they will suffer irreparable harm without preliminary injunctive relief because they: (i) face fines and interest for noncompliance or costs for compliance, as well as costs associated with defending against Defendants' efforts to resolve these issues in state court and arguing federal law issues in "unnecessary parallel state court proceedings," for which they "cannot obtain a refund [in this court] . . . due to sovereign immunity"; (ii) assert constitutional claims; and (iii) are likely to succeed on the merits. (*Siemens*, D.I. 23 at 18-19; *id.*, D.I. 32 at 5; *accord Eaton*, D.I. 28 at 17-19; *id.*, D.I. 36 at 7; *FOTL*, D.I. 25 at 18-21; *id.*, D.I. 34 at 7-8).[17] None of these arguments is availing.

First, Plaintiffs' arguments based on the fines, interest, and compliance and legal costs they may incur is insufficient because the legal costs have either already been incurred or would be unchanged whether the claims proceed here or in state court, whereas the fines, interest, and compliance costs are speculative and contingent on future events. Any legal costs associated with defending against Defendants' purported efforts to transfer the federal law issues in this case to state court have already been incurred – the filings necessitating and informing this opinion are the product of them – and the legal costs associated with arguing federal law issues in state court (setting aside that the Court has found the bulk of the issues in this case either unripe or improperly asserted) are likely to be the same as if Plaintiffs argued them here. Any fines or interest Plaintiffs may face are based on the amount ultimately assessed, which requires completion of the audits, which has not occurred. 12 *Del. C.* § 1183. Moreover, as Plaintiffs remain "free to 'simply refuse to cooperate,'" *see* Univar, 409 F. Supp. 3d at 281, and to contest any attempted enforcement

---

[17]  Plaintiffs also argue that when a claim of preemption has been advanced, the need to participate in a state regulatory process in conflict with federal policy creates a hardship that creates irreparable harm. (*Eaton*, D.I. 28 at 18-19; *FOTL*, D.I. 15 at 21; *Siemens*, D.I. 23 at 19-20). After the Court's analysis of Defendants' Motions to Dismiss, however, the preemption claims are no longer part of this case.

action, there is no indication the audits will be completed imminently.  Any compliance costs are similarly contingent on future events for the same reasons.  Thus, in contrast to the plaintiffs in *N.J. Retail*, which Plaintiffs rely upon, Plaintiffs are not currently in the position of having to choose between prosecution or fines for noncompliance versus turning over, at or by a set date, funds which they cannot recover even if they succeed on the merits due to state sovereign immunity.  *See* 669 F.3d at 388-89.

This lack of imminent threat of harm is highlighted by Plaintiffs' delay in bringing these motions.  Unjustified delay in filing a motion for preliminary injunction weighs against finding the harm asserted "irreparable."  *E.g.*, *Lanin v. Borough of Tenafly*, 515 F. App'x 114, 117-18 (3d Cir. 2013) (citing *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985)).  Plaintiffs have each been involved in their audits for years and were informed months before filing their suits of Defendants' desire to continue the audits despite their refusals to provide further information.  (*Eaton*, D.I. 35 Ex. C; *FOTL*, D.I. 31 Ex. C; *Siemens*, D.I. 1 Ex. M).  They were further reminded of that fact a few days before filing the Complaints via letters from Defendants that threatened the use of "administrative subpoena[s] and other applicable enforcement actions" to enforce the audits.  (*See Eaton*, D.I. 35 Ex. D; *FOTL*, D.I. 31 Ex. D; *and Siemens*, D.I. 1 Ex. N). Yet no Plaintiff requested preliminary injunctive relief in the Complaints or for five months after the Complaints were filed.  Plaintiffs argue they thought such requests unnecessary until receiving the April letters.  (*Eaton*, D.I. 28 at 2; *FOTL*, D.I. 25 at 6; *Siemens*, D.I. 23 at 2).  The content of the April letters, however, is, if anything, less alarming than that of the letters Plaintiffs received last year.  The April letters lack any explicit threat of "subpoena[s] or other applicable enforcement action."  (*See Eaton*, D.I. 35 Ex. E; *FOTL*, D.I. 31 Ex. E; *Siemens*, D.I. 25 Ex. A).  Thus, the Court

does not see why the most recent letters would have changed whether the asserted harms are imminent or irreparable.

Plaintiffs' second argument – that the constitutional nature of their claims necessitates a finding of irreparable harm – is unsupported.  Some courts have held, in the context of certain constitutional injuries, that no harm other than the constitutional violation itself need be shown in order to demonstrate irreparable harm for the purpose of a preliminary injunction.  *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").  "The Third Circuit[, however,] has made it clear that not all violations of constitutional rights constitute irreparable injury." *Norfolk S. Corp. v. Oberly*, 594 F. Supp. 514, 522 (D. Del. 1984) (citing *Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 820 n.33 (3d Cir. 1978) and rejecting argument similar to Plaintiffs based on alleged commerce clause violations); *see also Hohe v. Casey*, 868 F.2d 69, (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." (citing *City of Los Angeles v. Lyons*, 46 U.S. 95, 112-13 (1983))).  It has further instructed that, outside the First Amendment context, a denial of rights "may be more or less serious depending on the other injuries which accompany such deprivation." *Constructors Ass'n of W. Pa.*, 573 F.2d at 820 n.33 (referring specifically to a "denial of equal protection rights").  Even the out-of-circuit case cited by Plaintiffs in support of this argument instructs that where a constitutional violation has been asserted, it remains "necessary . . . to consider the specific character of the First Amendment claim" to determine if injunctive relief is appropriate.  *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003).  Yet Plaintiffs have cited no authority holding that a violation of procedural due process constitutes irreparable harm or indicating that the other injuries they assert are alternatively sufficient.  Nor

have they provided any explanation of why their procedural due process claim based on the appointment of contingent fee third-party auditors raise the same concerns as constitutional violations deemed to create irreparable harm on their own, focusing instead on their preemption and other due process claims, which are no longer at issue.

Lastly, Plaintiffs' argument that there is a presumption of irreparable harm where there is a strong likelihood of success on the merits is also unavailing.  First, the cases Plaintiffs cite do not support its contention that a likelihood for success on the merits of a procedural due process claim alone is sufficient in the Third Circuit to satisfy the "irreparable harm" inquiry.[18]  Second, Plaintiffs state that the primary, if not overwhelming, basis for this argument is the merits of their "federal preemption" claims, which they consider "the governing threshold issue here."  (*Eaton*,

---

[18]    *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-94 (2006) (rejecting "general rule" stated in patent cases like *Eaton Corp. v. Rockwell Intern. Corp.*, C.A. No. 97-421-JJF, 1997 WL 33708214 (D. Del. Nov. 4, 1997) and *Solarex Corp. v. Advanced Photovoltaic Sys., Inc.*, C.A. No. 93-229-JJF, 1995 WL 314742 (D. Del. Jan. 6, 1995) "that a permanent injunction will issue once infringement and validity have been adjudged"); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971) (discussing search and seizure claim); *N.J. Retail*, 669 F.3d at 388-89 (finding irreparable harm satisfied for reasons unrelated to likelihood of success on merits); *Am. Civil. Liberties Union v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003) (discussing First Amendment claims); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (discussing equal protection claims); *NCAA v. Christie*, 926 F. Supp. 2d 551, 578 (D.N.J. 2013) (discussing preemption claims); *Norfolk S. Corp.*, 594 F. Supp. at 522 ("[W[here the loss to Plaintiffs is purely monetary and that loss by itself is not an 'irreparable injury', any violation of the commerce clause does not constitute irreparable injury *per se*.  The Court concludes that any possible violation of the commerce clause is not the same as a violation of first amendment rights."); *Ass'n for Fairness in Bus. Inc. v. New Jersey*, 82 F. Supp. 2d 353, 363 (D.N.J. 2001) (finding "immediate irreparable harm" holding merely "buttressed" by unconstitutionality of statute at issue); *see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1148-49 (Fed. Cir. 2011) ("We . . . confirm that eBay jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief."); *Am. Ex. Travel Related Servs. Co., Inc*, 755 F. Supp. 2d at 614 (finding "immediate irreparable harm" holding merely "buttressed" by unconstitutionality of statute at issue).  Moreover, at least some of the language relied on by Plaintiffs in *American Civil Liberties Union v. Ashcroft* concerned other factors in the preliminary injunction analysis.

D.I. 46 at 3; *FOTL*, D.I. 42 at 3; *Siemens*, D.I. 40 at 3).  Pursuant to the Court's ruling on the motions to dismiss, however, those claims are not ripe and thus no longer in this case.  *See supra*.

Based on the foregoing, the Court finds that Plaintiffs have not shown that they are likely to suffer immediate irreparable harm absent the requested injunction.

### C.   The Remaining Factors

Because Plaintiffs have failed to establish that they would suffer irreparable harm without preliminary injunctive relief, the Court need not reach the remaining factors.  *Deluna v. Del. Harness Racing Comm'n*, C.A. No. 19-1788 (MN), 2019 WL 5067198, at *4 (Oct. 9, 2019) (citing *Bennington Foods LLC. v. St. Croix Renaissance, Grp.*, 528 F.3d 176, 179 (3d Cir. 2008) ("As we find that . . . there is no possibility of irreparable harm on the record before us, there is no need to analyze the other prongs of the test.")).  The absence of irreparable harm is alone a sufficient basis to deny Plaintiff's request for a TRO and preliminary injunction.  *E.g.*, *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 219 (3d Cir. 2014) ("Absent a showing of irreparable harm, a plaintiff is not entitled to injunctive relief, even if the other three elements are found (citing *NutraSweet*, 176 F.3d at 153)).

For the foregoing reasons, the Court will deny Plaintiff's motion for a Temporary Restraining Order and Preliminary Injunction at this time.  Should, however, circumstances change such that Plaintiffs are in a position where irreparable harm is present, they may seek appropriate injunctive relief at that time.

## IV.   REQUEST TO DECLINE JURISDICTION UNDER ABSTENTION AND/OR COMITY

Defendants' final argument in their motion to dismiss is that this Court should decline jurisdiction over Siemens' suit, and dismiss it without prejudice, "under the doctrines of abstention and comity because issues involving state law should be determined, in the first instance, by state

courts, when and if there is a ripe dispute regarding" Siemens' escheat obligations.  (*Siemens*,

D.I. 12 at 19-20).  It notes a passage in *Marathon* where the Third Circuit remarked:

> We are also cognizant of the availability of state law remedies if
> Delaware does make a formal demand for documents.  In light of
> some recent amendments to Delaware's abandoned property laws,
> there are some unanswered questions that bear on the audit [(noting
> a proposed Abandoned or Unclaimed Property Reporting and
> Examination Manual that was then being considered for notice and
> comment).]  As a matter of comity, it would be well if Delaware had
> the opportunity to address those issues in the first instance.  So, even
> if this challenge [to the scope of the audit] were ripe, we might
> "decline jurisdiction over a declaratory judgment action" to allow
> the state court system an opportunity to resolve those questions of
> state law. *See Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 137 (3d
> Cir. 2014) (concluding that it was not abuse of discretion for the
> district court to decline jurisdiction over a declaratory judgment
> action because state law issues "peculiarly within the purview of the
> [state] court system" were raised).

*Marathon*, 876 F.3d at 497-98; (*see also Siemens*, D.I. 12 at 19-20 (quoting same in part)).

Defendants further assert that "'[a]bstention is appropriate "in cases presenting a federal

constitutional issue which might be mooted or presented in a different posture by a state court

determination of pertinent state law,"'" (*Siemens*, D.I. 12 at 20 (quoting *Colo. River Water

Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976) (citations omitted))), and argues

that the Delaware Court of Chancery "is the proper forum for consideration of the Delaware

Escheats Law, and Siemens can raise any challenges to it in that court," (*id.* (citations omitted)).

Defendants compare this aspect of their motions to dismiss to one asserting *forum non conveniens*.

(*Id.*).

Yet Defendants do not identify any "unanswered questions" or subpoenas they have issued

that need or will soon be receiving resolution or clarification by state courts, nor do they explain

what issues might be mooted or presented in a different posture as a result of a state court

determination of state law.

Additionally, the Court notes that Defendants ask it to abstain from only one of these cases when they have admitted that all three are at least partially related, (*e.g.*, *Eaton*, D.I. 23), and when they have made similar arguments regarding most other aspects of the instant motions.  The only notable exception is that the fact that, unique to *Siemens*, Defendants are already in possession – allegedly improperly – of several million dollars of Siemens' money.

Thus, the Court will deny Defendants' request to decline jurisdiction over Siemens' action under the doctrines of abstention and/or comity at this time.  Plaintiffs (including Eaton, FOTL, and Siemens) and Defendants, however, shall file a joint letter of no more than two pages total with the Court within five days of the issuance of this opinion articulating their proposals for how these cases should move forward on the remaining claims.

## V.    <u>CONCLUSION</u>

For the foregoing reasons.  Defendants' motions to dismiss (*Eaton*, D.I. 14; *FOTL*, D.I. 15; *Siemens*, D.I. 11) are granted-in-part and denied-in-part and Plaintiffs' motions for preliminary injunctions (*Eaton*, D.I. 27; *FOTL*, D.I. 24; *Siemens*, D.I. 22) are denied.  An appropriate order will follow.